James TYSON, Petitioner,

v.

John KEANE, as Superintendent of Sing Sing Correctional Facility, Respondent.

No. 96 Civ. 8044(SAS).

United States District Court, S.D. New York.

Jan. 13, 1998.

Jeffrey L. Richman, Associate Appellate Counsel, Legal Aid Society, New York City, for Petitioner.

Daniel R. Wanderman, Assistant District Attorney, Bronx, NY, for Respondent.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Petitioner James Tyson seeks a writ of habeas corpus challenging his Supreme Court, Bronx County conviction for rape in the first degree. Part of the evidence presented against Tyson at trial consisted of a tape recorded telephone conversation in which a person identifying himself as "Tyson" did not deny committing the rape when so accused by the complaining witness. Before the trial began, Tyson asked the trial court for funds to hire an expert witness to

verify his contention that the voice on the tape was not his. This request was denied, and Tyson was convicted.

On appeal, the Appellate Division, First Department, held that the trial court had erred in refusing to provide the requested expert. However, it did not grant Tyson a new trial; instead, it held his conviction in abeyance so an expert could be retained and an appropriate study completed. If the expert were to conclude that the voice on the tape was not Tyson's, according to the court, an evidentiary hearing would have to be held to determine the admissibility of the expert's testimony. Tyson sought leave to appeal the decision not to grant a new trial; this application, however, was denied by the Court of Appeals.

Pursuant to the Appellate Division's ruling, Tyson retained an expert witness and a study was conducted. The expert concluded that, contrary to Tyson's testimony at trial, the voice on the tape was indeed his. However, the expert also concluded, in light of "linguistic discourse analysis," that the conversation was not probative of Tyson's guilt. Specifically, the expert found that Tyson's speech impediment, combined with the complainant's verbal assertiveness, might have prevented Tyson from making a denial when the complainant accused him of rape.

The Appellate Division then affirmed Tyson's conviction, and leave to appeal to the Court of Appeals was denied. Tyson filed this petition on October 25, 1996. The petition was referred to Magistrate Judge Peck for a Report and Recommendation. On November 19, 1997, the Magistrate issued a Report recommending that the petition be denied. The Magistrate did not address the question of whether the trial court erred in refusing funding for the expert; instead, he suggested that the error, if any, was harmless.

Though he concurred in the Magistrate's proposed result, the respondent made two objections to the Report: 1) that it characterized the crime at issue as a "date rape," and 2) that it did not address respondent's argument that Tyson is procedurally barred from raising his Constitutional claims in this action. Tyson objected to the Report's "harm-

less error" analysis. After consideration of these objections and a de novo review of the record, I accept and adopt the thoughtful and thorough Report of the Magistrate.

## I. Legal Standard

Under 28 U.S.C. § 636(b)(1)(A) and (B), a designated magistrate judge may issue a Report and Recommendation regarding a motion for summary judgment. The parties are given ten days to object to such a report; after objections are received, the district court must review de novo those portions of the report to which objections are made. In this case, each party filed timely objections which are considered below.

## II. Objections to the Magistrate's Report

### A. The Respondent's Objections

#### 1. Use of the term "date rape"

■ The respondent first objects to the fact that the Report refers to the crime at issue as a "date rape." The basis of this objection is a distinction the respondent draws between "date rape" and "forcible rape," and an implicit assertion that "date rape" is a crime of lesser gravity. See Respondent's Objections to Report and Recommendation at unnumbered pages 1–2 (objecting to the Report's use of the words "date rape" because "[t]he harrowing account given at trial by [the complainant] clearly established ... that petitioner was guilty of forcible rape."). It need hardly be said, of course, that no distinction between "date" and "forcible" rape exists in the law. See N.Y. Penal Law § 130.35 (McKinney 1997) (making no special provisions for "date rapes"). Moreover, the respondent's apparent belief that rape is a less serious crime if it happens to occur during a date is as repugnant as it is unsupported. That such a theory would even be advanced in a brief submitted by one of our city's major prosecutorial offices is deeply troubling.

■ Finally, it is apparent that the Magistrate's use of the term "date rape" was not intended to denigrate the seriousness of the crime charged, but rather to emphasize the importance of the primary witnesses' credi-

bility in light of the fact that the only disputed issue at trial was whether the complainant had consented to intercourse. This was a fact worthy of emphasis, because the trial court had denied authorization for Tyson's proposed expert witness partially on the ground that the authenticity of the tape recording was "not a central issue to the case." March 24, 1992 Hearing Transcript at 3–4. The trial court reasoned that even if an expert testified that Tyson's voice was not the one on the tape, this evidence would only go to show that the complainant had misidentified her attacker's voice. Because the complainant's ability to identify Tyson was not in dispute, the court concluded, the tape's authenticity was not vital to the outcome of the case. *See id.* As the Report recognized, this reasoning was erroneous: Evidence that the man who identified himself as "Tyson" on the tape was an imposter could have led a reasonable juror to question the complainant's general truthfulness, and thus to doubt her contention that a rape had occurred. *See* Report and Recommendation at 18 ("Expert testimony proving that it was not Tyson's voice on the tape would seriously damage the complainant's credibility, obviously a key issue in a date rape case."). The Report's use of the term "date rape" served to illustrate the importance of the evidence the expert might have been able to provide. Thus, the use of the term was logically appropriate and legally unobjectionable.

### 2. Failure to address respondent's procedural argument

The respondent also argues that the Magistrate erred in not finding Tyson's constitutional claims to be procedurally barred. In his habeas petition, Tyson asserts that the trial court denied him his due process, equal protection and effective assistance of counsel rights by failing to authorize funds for the proposed expert.[1] He raised substantially the same claim on his direct appeal to the Appellate Division. As noted above, that court held that the trial court abused its discretion in denying Tyson the funds necessary to retain an expert. As a result, the appellate court remanded for a hearing on the admissibility of any exculpatory evidence the expert might produce. In his application for leave to appeal to the Court of Appeals, Tyson only sought review of the Appellate Division's decision that an evidentiary hearing—rather than a new trial—was the appropriate remedy for the trial court's error. Naturally, he did not appeal the Appellate Division's favorable ruling that the trial court had erred in denying him funds to retain an expert. Nevertheless, respondent claims that because Tyson did not appeal this favorable ruling, he is barred from now raising his constitutional claim.

The Magistrate did not address this argument because it is utterly without merit. It is true that failure to raise a claim in a state court appeal may bar a petitioner from raising it in a habeas corpus proceeding, absent a showing of good cause and prejudice, even when such claims can no longer be raised in state court. *See Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991) (citing *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) and *Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). However, petitioner could hardly be expected to appeal from a decision in his favor. Appeal need not be taken when doing so would be futile. *See, e.g., Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). While "futility" in this context generally refers to deficiencies in a state court's appellate process, *see id.,* it would surely describe an appeal taken from a favorable determination as well. It was therefore appropriate for the Magistrate to reach the merits of Tyson's claim.

---

1. These claims are based on the Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which requires trial courts to provide indigent defendants with the assistance of expert witnesses in circumstances identified by application of a three-factor test:

   "The first is private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not protected."
   *Id.* at 77.

## B. Tyson's Objections

Tyson objects to the Magistrate's conclusion that even if the trial court erred in denying funding for an expert, such error was harmless. According to the Report, the most important ground for this conclusion was the fact that Tyson had not met his burden of showing that the "linguistic discourse analysis" his expert provided would have been admissible at trial. *See* Report at 24–27. Tyson does not dispute the inadmissibility of this evidence; instead, he argues that if the proposed expert had been hired, his attorney would have known that the tape was authentic and therefore would have used a different, and perhaps more successful, strategy at trial.

When a federal court conducts a habeas review of a conviction, the standard it applies is less stringent than it would be if the court were conducting a direct appellate review. *See Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). An appellate court will set aside a conviction if there is constitutional error that is not "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Peck v. United States,* 106 F.3d 450, 454 (2d Cir. 1997). On the other hand, absent a fundamental, "structural" error,[2] habeas relief is only granted when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). If "grave doubt" exists as to the harmlessness of the error, habeas relief must be granted. *Agard v. Portuondo,* 117 F.3d 696, 714 (2d Cir.1997) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

The trial court's purported error was harmless under this standard. Tyson suggests no reason why his now-preferred defense—that the tape was authentic, but his "admissions" were not truly inculpatory because the complainant was effectively putting words in his mouth—would have been more successful at trial than the defense he actually presented. While Tyson's conviction proves that the defense raised at trial failed, this does not mean that it could not have worked, nor that the new defense would have been more likely to. I accept the proposition that the trial court's decision had an "effect" on the trial in the sense that the issues presented would have been different had the expert testimony been available; however, to have an *"injurious* effect," as the habeas standard requires, the erroneous decision must have led to a trial that was not only different, but less favorable to the defendant than the one he otherwise would have had. *Brecht,* 507 U.S. at 637 (emphasis added). If anything, however, it appears that the trial court's purported error may have *improved* Tyson's chance for an acquittal at trial: Under his now-preferred defense, Tyson would have to explain, for example, why his taped statement to the complainant, "I didn't mean to rape you," was not truly probative of his guilt. At first blush, at least, a stout denial that he ever made such a comment would appear to be significantly more credible. For aught that appears, then, the trial court's purported error may have had a beneficial rather than an injurious effect on the trial, from Tyson's point of view.

The absence of any injury to Tyson is made still clearer by the fact that nothing prevented him from raising his now-preferred defense at trial, even without the benefit of the expert. As Tyson himself points out:

2. "Structural" errors are "defects in the constitution of the trial mechanism" of sufficient magnitude to render the criminal process itself unable to "reliably serve its function as a vehicle for determination of guilt or innocence." *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (internal citation omitted). "[B]ecause they infect the entire trial process," structural errors require automatic reversal. *Brecht,* 507 U.S. at 630. Trial errors, on the other hand, occur "during the presentation of the case to the jury, and [are] amenable to harmless-error analysis because [they] may be quantitatively assessed in the context of other evidence presented in order to determine the effect [they] had on the trial." *Id.* at 629 (internal quotations omitted). The parties do not dispute the Magistrate's implicit finding that the purported error at issue here was of the "trial" type.

It is possible that defense counsel, even in the absence of any ... suggestion by the expert ... would have decided to admit at trial that it was petitioner's voice on the tape, but to minimize the impact of the tape by arguing to the jury that the complainant was dominating the conversation, was putting words in [Tyson's] mouth, and petitioner was therefore not admitting that he had committed any of the crimes charged. That argument is apparent from review of the transcript....

Petitioner's Objections to Report and Recommendation at 4. According to Tyson, then, the effect the trial court's error had was that it encouraged the defense counsel to pursue one explanation of the tape evidence at the expense of a different, equally available one. But this argument is unavailing. There is no reason why the defense counsel had to choose one explanation over the other: He could have argued to the jury that 1) the voice on the tape was not Tyson's, but 2) even if it were, it would not be probative of guilt. Thus, the only possible effect of the trial court's decision was to provide a modest incentive for the defense counsel to spend more time on the former argument at the expense of the latter. If errors with such minor consequences warranted habeas relief, the harmless error doctrine would be effectively eviscerated. Tyson has therefore failed to identify any "substantial" effect the trial court's decision had on the outcome of the trial. *Brecht,* 507 U.S. at 637.

### III. Conclusion

Having considered the parties' objections to the Magistrate Judge's Report and Recommendation and having conducted a de novo review of the record, I accept the Report and adopt it as the opinion of this Court.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

James Tyson seeks a writ of habeas corpus from his "date rape" conviction. The evi-

dence against Tyson at trial included the complainant's tape recorded telephone conversation with someone who identified himself as "Tyson" and admitted the rape. Before trial, Tyson asked the trial court for funds for an expert to show that the voice on the tape was not his. The trial court denied the request, Tyson was convicted, and on appeal the First Department remanded to allow an expert to examine the tape. Tyson's expert concluded that, contrary to Tyson's trial testimony, the voice on the tape was Tyson's; using "linguistic discourse analysis," however, the expert concluded that because of Tyson's speech impediment, he was incapable of offering denials when confronted with the victim's accusations. The trial court and First Department affirmed Tyson's conviction. The issue on the peculiar facts of this case is whether the trial court's initial refusal to fund the requested expert testimony requires the Court to set aside Tyson's conviction. For the reasons set forth below, I recommend that Tyson's habeas petition be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 29, 1992, Tyson was convicted after a jury trial of rape in the first degree, and was sentenced to ten to twenty years of imprisonment. (Petition ¶¶ 1–6; Tyson Reply Br. at 17–18; Affidavit of Assistant District Attorney Karin R. Vandevenne ¶ 4.) *See also Tyson v. Keane,* 1997 WL 189125 at *1 (S.D.N.Y. 1997).[1]

*Tyson's Pre–Trial Request for Payment for Voice Analysis of the Tape*

"When defense counsel was informed before trial that the prosecution had obtained an audiotape from the complainant on which petitioner purportedly admitted raping her, he confronted his client, who denied that it was his voice on that tape." (Tyson Reply Br. at 1; *see* 3/26/92 Hearing Tr. at 4–5.)

On March 24, 1992, Tyson's defense counsel sought court approval for payment for

---

1. Tyson filed his habeas petition pro se and sought appointment of counsel. Judge Scheindlin granted his application. *Tyson v. Keane,* 1997 WL 189125. Jeffrey Richman, who had argued

Tyson's state court appeals, agreed to represent Tyson and filed a lengthy "reply brief" on Tyson's behalf. The Court expresses its appreciation to Mr. Richman for representing Tyson.

"an expert to analyze the tape." (Tyson Reply Br. at 5; 3/24/92 Hearing Tr. at 2.) The trial judge denied the request, stating:

> THE COURT: I'm not going to approve payment for whatever it is. I don't think that the State has funds available for whatever it is.
>
> What is authorized for physicians and psychiatrists is what you are requesting and it appears to me that the issue that could be resolved by this tape is really a— not a central issue to the case since the identification of the defendant here is made on the basis that the complainant knows him.
>
> The voice (sic) is not a voice identification. The issue is whether one piece of the People's evidence was authored by the defendant or not.
>
> DEFENSE COUNSEL: Well, except in this case the complaining witness has stated to the District Attorney and to the Grand Jury that she spoke to him on the phone, that it was definitely James Tyson and that she recorded his voice and that he made incriminating statements.
>
> Now, if it comes back with the tape analysis that it's not James Tyson, I would say to the court that that seriously questions the credibility of the complaining witness, and I think everybody will agree with me on that point and would throw this whole case into question, and I disagree with Your Honor, that it's some collateral issue.
>
> I think this issue really does go to the heart of the case, the credibility of the complaining witness.

(Tyson Reply Br. at 5–6, quoting 3/24/92 Hearing Tr. at 3–4.) The trial court denied the request. (Tyson Reply Br. at 6; 3/24/92 Hearing Tr. at 4–5.)

Tyson's counsel renewed his request at a hearing two days later. (3/26/92 Hearing Tr. at 4–14.) Tyson's counsel informed the court that "Mr. Tyson, after listening to the tape and after reading the transcript, says that it is definitely not my voice on the tape." (3/26/92 Hearing Tr. at 5.) Counsel contacted Dr. Rafaella, who had testified as an expert in "voice print analysis" in prior cases. (Id. at 5–6.) Counsel cited cases admitting spectrographic voice analysis, and explained that "if we can prove, through scientific analysis, that the tape is a fraud [i.e., if it is not Tyson's voice], then that seriously throws into question the credibility of this complaining witness and could seriously throw into question the entire validity of the People's case, period." (Id. at 8.) The trial court reiterated its refusal to "authorize the expenditure of some two hundred dollars an hour to have this done." (Id. at 10.) The trial court explained that scientific and court acceptance of spectrographic voice analysis "is ambiguous, at best" and the "trend is to find that this is not admissible." (Id. at 10–11.) Second, because the complainant knew Tyson from before the rape, the trial judge believed the voice analysis would "not go to the guilt or innocence of the defendant," but would be "collateral." (Id. at 11–12.) Defense counsel stressed that since the tape went to "the credibility of the complaining witness [it] is not a collateral matter" but rather it "is crucial, that it is central to the entire case here in this particular type of case," i.e., a date rape case. (Id. at 12–13.) Defense counsel also stated that if the trial court felt it was collateral, the court should prohibit the introduction of the tape. (Id. at 14.)

### Tyson's Trial

The trial court admitted the tape at trial. (See Tyson Reply Br. at 11–13 & n. 6.) The complainant testified to Tyson's "date rape" of her. (See id. at 9–11.) The complainant testified that Tyson called her at home later that day and that she recorded the conversation on her answering machine tape. (Trial Tr. at 91–95, 235–37.) She testified that she recognized the male voice on the tape as Tyson's. (Id. at 94–96, 106, 248–49.) The tape was played for the jury and they were provided with a transcript of it. (Id. at 248–53.) The trial judge instructed the jury that they would have to judge the complainant's credibility when she identified the male voice on the tape as Tyson's. (Id. at 250–52; see also Tyson Reply Br. at 11 n. 6.)

The taped conversation began with a male voice identifying himself as "Tyson." (Tyson Reply Br. at 12, quoting Tape Transcript ("T") at 1; see also Vandevenne Aff. Ex. 4,

which includes a transcript of the tape.) The tape continued:

[Complainant]: Did I entice you and make you do that?

MR. TYSON: No. I'm—I'm sorry.

\* \* \*

[Complainant]: I said because I'm your friend and you raped me. That's why you feel bad.

MR. TYSON: That I—

[Complainant]: I knew you didn't mean to do it, but that's what you did. That's why you feel bad, right?

MR. TYSON: Yeah.

[Complainant]: I don't know, you just, I don't know you just lost it. You just.

MR. TYSON: Huh?

[Complainant]: I don't know you just totally lost it. You never did that be, before? You never went off like that before?

MR. TYSON; No.

[Complainant]: So why would you rape me, me of all people?

MR. TYSON: I didn't mean to rape you,

[Complainant]: But you did.

MR. TYSON: I didn't mean to.

(Tyson Reply Br. at 12–13 & State Br. at 4 n. 4, quoting T3, T7–8; *see also* Vandevenne Aff. Ex. 4: Tape Transcript.)

Tyson testified at trial in his own defense. (Trial Tr. at 358 ff.) He testified that he had consensual sex with the complainant, which she initiated. (*Id.* at 377–86, 391, 410, 414.) Tyson denied calling her afterwards and denied that the voice on the tape was his. (*Id.* at 388–89, 404–05, 414–15.)

In closing argument, defense counsel attacked the chain of custody of the tape, pointed out that there was no scientific analysis of the tape, and said that anyone could have identified himself as "Tyson." (*Id.* at 426–33.)

The tape was re-played for the jurors during deliberation, at their request. (*Id.* at 516–19.) The jury returned a verdict of guilty of rape in the first degree. (Trial Tr. at 521–22.) On July 29, 1992, Tyson was sentenced to ten to twenty years imprison-

ment, with the trial judge noting that "on every occasion that you testified in this courtroom you lied." (7/29/92 Sentencing Tr. at 7–8.)

*Tyson's Initial Appeal to the First Department*

Tyson appealed to the First Department, challenging the trial court's refusal to authorize payment for voice analysis of the tape. (Vandevenne Aff. ¶ 6 & Ex. 1: Tyson 1st Dep't Br. at 19–34.) Tyson argued that the appropriate remedy was a new trial. (Vandevenne Aff. Ex. 1: Tyson 1st Dep't Br. at 34.) *See also Tyson v. Keane,* 1997 WL 189125 at *1.

The First Department's ruling "held in abeyance" Tyson's appeal, approved the expenditure for Tyson "to retain an independent court-appointed spectrographic expert to conduct voice analysis," and remanded for a hearing on the admissibility of that expert testimony "in the event the spectrographic expert reaches an exculpatory result." *People v. Tyson,* 209 A.D.2d 354, 354–55, 618 N.Y.S.2d 796, 797 (1st Dep't 1994). The First Department explained, in full:

It was an abuse of discretion to deny defendant's request for a reasonable expenditure to test whether a voice on a tape offered in evidence, in which defendant allegedly admitted the crime, was in fact defendant's. Defendant established extraordinary circumstances justifying compensation for the test, the results of which could have severely damaged the victim's credibility. A preliminary hearing must then be held to determine the scientific reliability of the test should the expert conclude that the voice on the tape was not defendant's. Of course, the expert must, in the first instance supervise the creation of the defendant's voice exemplar.

*Id.* (citations omitted). *See also Tyson v. Keane,* 1997 WL 189125 at *1–2.

*The Expert's Analysis on Remand*

Tyson's counsel retained the firm of Yonovitz & Joe to analyze the tape. (*See* Tyson Reply Br. at 18; Vandevenne Aff. ¶ 8 & Ex. 4: 2/8/96 Yonovitz & Joe Report.) The defense expert concluded that the male voice on

the tape was Tyson's. (Vandevenne Aff. Ex. 4: 2/8/96 Yonovitz & Joe Report at 1: "it is concluded that it is Mr. Tyson's voice on the ... tape.")

Yonovitz & Joe also concluded, however, that use of "linguistic discourse analysis," "would provide a basis for the essential defense of Mr. Tyson." (*Id.* at 1.) According to Yonovitz & Joe, "[d]iscourse analysis is a scientific analysis of the structure of conversations to reveal speakers' intent in the recorded verbal acts .... [and] can expose manipulative strategies that may lead to injustice." (*Id.*) Based on this linguistic discourse analysis, Yonovitz & Joe concluded that certain "themes are relevant to understanding the discourse between [the complainant] and Mr. Tyson" (*id.*), as follows:

THEME 1:

Mr. Tyson is a low assertive, high responsive communicator, while [the complainant] takes the high assertive, low responsive role in all three of these conversations. He has a stuttering disfluency, which is very likely to be a contributing factor in his low assertiveness, which is pronounced enough to be described as reticence. *His personal history as a stutterer could explain why he does not offer denials, objections or explanations when [the complainant] makes statements that assume his guilt.*

\* \* \*

THEME 2:

[The complainant] controls the topics and does approximately 90% of the talking, making these conversations remarkably unbalanced.... [The complainant] is apparently recreating an event through the mechanism of her dominating spoken discourse. *It is quite possible, in this way, for consenting sexual intercourse to later be reconstructed as rape.*

(*Id.* at 304, emphasis added.) *See also Tyson v. Keane,* 1997 WL 189125 at \*2.

The trial court held a hearing on February 13, 1996. (9/24/97 Richman Letter Ex. B: 2/13/96 Hearing Tr.) Defense counsel presented the Yonovitz & Joe report, and their curriculum vitae, to the court. (*Id.* at 9.)

Defense counsel informed the trial court that "it has been determined to a scientific certainty by Dr. Yonovitz that the voice introduced at trial on the tape was Mr. Tyson's." (*Id.* at 5.) The trial judge retorted: "That your client swore was not his voice." (*Id.*) Defense counsel noted that "it is the position of the defense that Mr. Tyson received ineffective assistance of counsel ... because of the Court's failure to approve funds to have the tape examined. The whole approach to the case was dramatically altered." (*Id.* at 6.) Defense counsel explained that he would have withdrawn from the case or if he continued, would not have cooperated with Tyson in presenting Tyson's testimony. (*Id.*) Defense counsel said he would have advised Tyson not to take the stand, and faced with scientific analysis showing it was his voice on the tape, perhaps Tyson would have been more forthcoming with defense counsel. (*Id.* at 7.) "So the entire approach to the case would have been completely different." (*Id.*)

Defense counsel also noted that discourse analysis—something he admitted he "had never heard of before" (*id.*)—showed that the complainant was manipulating Tyson. (Id. at 7–8.) Defense counsel concluded:

In short, Judge, just to wrap it all up, even though the tape has been shown to be Mr. Tyson's voice, it does not necessarily indicate or reveal that he is guilty of the rape. It indicates his voice is the voice that is actually on the tape, and that had we had that information in advance, the entire approach of the case would have been different and since the entire approach of the case would have been different, the outcome of the case may have been different, but because the Court abused its discretion in refusing to allocate funds, we believe that Mr. Tyson received ineffective assistance of counsel and the only remedy is for Mr. Tyson to have an entirely new trial.

(*Id.* at 9–10.) The trial judge rejected the argument, on the ground that the expert's opinion was inadmissible:

I must say that the grounds that you have advanced are novel; that this scientific testimony which has not been shown to meet the five standards necessary for admission

into evidence, if this information had been known to the defense, the defendant would not have had to lie during the course of his testimony and deny that he did rape this complaining witness. . . .

(*Id.* at 10.) *See also Tyson v. Keane*, 1997 WL 189125 at *2.

Tyson's appellate counsel filed a supplemental brief to the First Department, seeking a new trial. (*See* Vandevenne Aff. Ex. 5: Tyson Supp. Br. at 1st Dep't.)

*The First Department Rules Against Tyson*

On May 30, 1996, the First Department affirmed Tyson's conviction, stating in full:

At trial, a telephone answering tape was admitted into evidence, allegedly as a conversation between the complainant and the defendant. The defendant contended that it was not his voice on the tape and requested that it be tested. The court denied the application, and on appeal, this Court held the appeal in abeyance and remanded for a spectrograph voice identification hearing (209 A.D.2d 354, 618 N.Y.S.2d 796).

The tape was analyzed by an expert procured by the defendant. The expert reported that the voice on the tape was that of defendant, but that the speech patterns offer a defense that defendant was not confessing to the crime. The defendant, having testified at the trial that it was not his voice on the tape, contends that since it is his voice, and that if he had known the expert's opinion regarding speech patterns at the time of trial, he would have fashioned his defense differently and, therefore, that he was ineffectively represented at trial. In effect, the defendant is requesting a new trial, which would give him a chance to test a new defense in which he will not testify but will admit that it was his voice on the tape and argue he was not confessing to the rape. The jury has heard and already assessed the meaning of the taped conversation. We find this argument and the other arguments presented by the defendant meritless. *People v. Tyson*, 227 A.D.2d 322, 322, 643 N.Y.S.2d 537, 538 (1st Dep't), *leave to appeal denied*, 88 N.Y.2d 996, 649 N.Y.S.2d 403, 672 N.E.2d 629 (1996).

*Tyson's Present Habeas Petition*

In September 1996, Tyson filed this habeas petition pro se, raising two grounds: that (1) the trial court's initial refusal to fund an expert analysis of the tape violated his "rights to due process, equal protection, and the effective assistance of counsel," and (2) "[r]eversal and [r]emand for a new trial is the appropriate remedy for the trial court's abuse of its discretion in failing to appoint an expert before trial to aid the defense." (Petition ¶ 12.) Judge Scheindlin granted Tyson's application for appointment of counsel. *Tyson v. Keane*, 96 Civ. 8044, 1997 WL 189125 (S.D.N.Y. April 18, 1997). Jeffrey Richman, Tyson's state appellate counsel, filed a lengthy reply brief on Tyson's behalf, and a supplemental letter in response to this Court's questions about linguistic discourse analysis.

## ANALYSIS

### I. TYSON'S CONSTITUTIONAL RIGHT TO EXPERT ASSISTANCE IN PREPARING HIS DEFENSE

The Supreme Court's decisions in "*Griffin v. Illinois* and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971) (referring to *Griffin v. Illinois*, 351 U.S. 12, 19–20, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) (state must provide trial transcript to indigent criminal defendant where necessary for appeal)).

In *Ake v. Oklahoma*, the Supreme Court extended the definition of "basic tools" to include expert assistance by a psychiatrist where the defendant's sanity at the time of the offense is a significant factor at trial. 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). The Supreme Court explained:

This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present

his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. In recognition of this right, this Court held almost 30 years ago that once a State offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits of the appeal. Since then, this Court has held that an indigent defendant may not be required to pay a fee before filing a notice of appeal of his conviction, that an indigent defendant is entitled to the assistance of counsel at trial, and on his first direct appeal as of right, and that such assistance must be effective. . . .

Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, *while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system."* To implement this principle, *we have focused on identifying the "basic tools of an adequate defense or appeal," and we have required that such tools be provided to those defendants who cannot afford to pay for them.*

*Ake v. Oklahoma,* 470 U.S. at 76–77, 105 S.Ct. at 1092–93, 84 L.Ed.2d 53 (emphasis added & citations omitted)

In *Ake,* the Supreme Court held that in determining what is a "basic tool" that must be provided, three factors are relevant:

The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Ake v. Oklahoma,* 470 U.S. at 77, 105 S.Ct. at 1093, 84 L.Ed.2d 53.

Under the Supreme Court's *Ake* analysis, however, the third prong usually is key. As to the first prong, the Supreme Court instructed that the "private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling . . . and weighs heavily in [the] analysis." *Id.* at 78, 105 S.Ct. at 1093. As to the second prong, the Supreme Court found it "difficult to identify any interest of the State, other than that in its economy, that weighs against recognition of this right." *Id.* at 78, 105 S.Ct. at 1093–94. The same is true here.

Thus, Tyson's case turns on *Ake*'s third prong: determining the probable value of the expert assistance that Tyson sought.

Although the Supreme Court's *Ake* decision was directed only to expert psychiatric assistance, subsequent appellate court decisions have applied *Ake*'s analysis to determine whether various other types of expert assistance. must be provided to an indigent criminal defendant. *See Little v. Armontrout,* 835 F.2d 1240, 1243–44 (8th Cir.1987) (applying *Ake's* analysis to determine whether an indigent defendant was entitled to a hypnotic expert), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *Moore v. Kemp,* 809 F.2d 702, 709–12 (11th Cir.) (en banc) (applying *Ake's* analysis to determine whether an indigent defendant was entitled to a "criminologist or other expert witness"), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987); *see also Barnard v. Henderson,* 514 F.2d 744, 746 (5th Cir.1975) (habeas petition granted because petitioner was entitled to appointed ballistics expert to examine critical evidence).

In *Little v. Armontrout*, the Eighth Circuit explained that "[t]here is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given." 835 F.2d at 1243. Specifically, the Court stated that, "the defendant must show a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." *Id.* at 1244; *accord, e.g., Moore v. Kemp*, 809 F.2d at 712. The Eleventh Circuit made clear that "due process does not require the government automatically to provide indigent defendants with expert assistance upon demand." *Moore v. Kemp*, 809 F.2d at 712. Where the criminal defendant " 'offered little more than undeveloped assertions that the requested [expert] assistance would be beneficial, [there was] no deprivation of due process.' " *Moore v. Kemp*, 809 F.2d at 711 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 324 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985)). *Moore* therefore elaborated on what the indigent criminal defendant would need to show:

> In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appoint-

ed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case.

*Moore v. Kemp*, 809 F.2d at 712.[2] This Court agrees with the reasoning of the Eighth and Eleventh Circuits in *Little* and *Moore*.

Under *Ake's* third prong, the trial court erred in not approving payment for an expert to analyze the voice on the answering machine tape, provided that such voice analysis would be admissible expert testimony under New York law. In other words, if admissible, the expert would have aided Tyson's defense by seriously damaging the complainant's credibility, and denial of such expert assistance would result in an unfair trial. In the "date rape" context, where Tyson admitted he had sex with the complainant and claimed it was consensual, and the complainant claimed it was rape, the taped "admission" was not "collateral," as the trial court ruled, but a critical piece of evidence. The complainant claimed that the male voice on her answering machine tape was Tyson's. Expert testimony proving that it was not Tyson's voice on the tape would seriously damage the complainant's credibility, obviously a key issue in a date rape case. Thus, if expert testimony on voice identification were admissible in New York, the trial court clearly should have paid for such an expert for Tyson based on the record as it stood before trial. Indeed, the First Department's ruling is entirely consistent with this Court's analysis. *See People v. Tyson*, 209 A.D.2d

---

**2.** In federal criminal trials, the Criminal Justice Act of 1964 provides that:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court ... shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1).

Under § 3006(A)(e)(1)'s more "liberal" approach to indigent requests for expert assistance, " 'a judge is still obligated to exercise [her] discretion in determining whether such services are necessary' " and the defendant " 'must articulate a reasonable basis for [the requested services].' " *United States v. Sanchez*, 912 F.2d 18, 21–22 (2d Cir.1990) (no error to refuse to appoint expert where defendant refused to submit affidavit that item to be tested was not his); *accord, e.g., United States v. Oliver*, 626 F.2d 254, 259–60 (2d Cir.1980).

354, 354–55, 618 N.Y.S.2d 796, 797 (1st Dep't 1994).

The issue then is whether New York courts, in 1992, would have admitted into evidence expert spectrographic voice identification evidence.

New York's lower courts were (and still are) split as to the admissibility of expert spectrographic voice identification evidence. *Compare People v. Townsend,* 193 A.D.2d 830, 830–31, 597 N.Y.S.2d 254, 254 (3d Dep't) (noting in passing, without discussion, that defendant had "presented an expert sound spectrograph analysis [at trial] in an attempt to establish that the voice of the drug dealer on the transaction tape was not his."), *appeal denied,* 82 N.Y.2d 727, 602 N.Y.S.2d 825, 622 N.E.2d 326 (1993), *and People v. Bein,* 114 Misc.2d 1021, 1027, 453 N.Y.S.2d 343, 347 (Sup.Ct.N.Y.Co.1982) (admissible: "this court finds that voice identification by spectrographic analysis has been shown to be a sufficiently reliable procedure, such that the results of a voice print test may be submitted to the jury for consideration. Furthermore, the [expert's] testimony convinces the court that the procedure has been generally accepted in the relevant scientific community."), *and People v. Rogers,* 86 Misc.2d 868, 881, 385 N.Y.S.2d 228, 237 (Sup.Ct.1976) (admissible: "The decisions of approximately 50 different trial courts from state and federal jurisdictions have nearly unanimously reflected the acceptance of voice spectrographic identification following Dr. Tosi's study. At the United States District Court level, 14 of 15 judges who have ruled on the issue of admissibility have accepted voiceprint evidence, while all but two of the 37 state courts which have reached the issue have held such evidence admissible.... It is the opinion of this court that voice identification by means of visual spectrogram analysis, when accompanied by aural examinations and comparisons and when conducted by a properly qualified examiner, has now reached the level of general acceptance by those who would be expected to be familiar with its use. Voice spectrogram analysis has reached the standards of scientific acceptance and reliability necessary for its admissibility into evidence with ultimate consideration by the trier of

the facts.") *with People v. Persaud,* 226 A.D.2d 402, 402–03, 640 N.Y.S.2d 261, 262 (2d Dep't) (inadmissible: trial court did not err in precluding expert spectrographic voice identification testimony where "at a hearing held pursuant to *Frye v. United States,* 293 F. 1013, the defendant failed to proffer evidence sufficient to establish, *inter alia,* that the use of spectrographic voice analysis to negate a voice print match is a technique or procedure generally accepted within the scientific community as capable of being performed reliably."), *appeal denied,* 88 N.Y.2d 940, 647 N.Y.S.2d 173 (1996), *and People v. Collins,* 94 Misc.2d 704, 712, 405 N.Y.S.2d 365, 370 (Sup.Ct. 1978) (inadmissible: the scientific "proponents of sound spectrography for voice identification are distinctly in the minority, and the remainder of the scientific community has either expressed opposition or has expressed no opinion perhaps necessarily, owing to the incomplete and preliminary nature of the work in this field."). *See also United States v. Williams,* 583 F.2d 1194, 1196–200 (2d Cir.1978) (applying *Frye* standard, Second Circuit finds spectrographic voice analysis expert testimony admissible in federal criminal trial; notes that "the weight of authority supports the admissibility of spectrographic voice identification evidence"), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

The New York Court of Appeals has not decided the issue. In *People v. Jeter,* 80 N.Y.2d 818, 820–21, 587 N.Y.S.2d 583, 585, 600 N.E.2d 214 (1992), the Court of Appeals held that the trial court had erred in admitting voice spectrographic analysis without a preliminary inquiry into its reliability, in light of the split authority in case law and scientific literature:

We do not agree that the court could properly have determined that voice spectrography is generally accepted as reliable based on the case law and existing literature on the subject. In this instance, there is marked conflict in the judicial and legal authorities as to the reliability of the procedure. New York courts are split on the issue of admissibility (*see, People v. Bein, supra; People v. Collins, supra; People v. Rogers, supra*). Moreover, while several jurisdictions have held that voice spectrog-

raphy evidence is sufficiently reliable to be admissible, others have reached just the opposite conclusion. The legal scholarship on the admissibility of voice spectrography is likewise conflicting. We conclude that the trial court lacked a proper basis to admit the voice spectrographic evidence without a preliminary inquiry into reliability.

*Id.* (citations omitted). Thus, the issue remains open in New York State.

This Court need not try to predict how the New York Court of Appeals ultimately will decide whether expert spectrographic voice identification testimony is admissible. Even assuming that such expert testimony would have been held to be admissible in New York in 1992, the trial court's refusal to approve payment for such an expert for Tyson is harmless error on the peculiar facts of this case as reflected in the expert's post-trial analysis. The Court addresses that issue in Point II, below.

## II. *THE TRIAL COURT'S ERROR IN DENYING FUNDS FOR EXPERT VOICE IDENTIFICATION ANALYSIS WAS HARMLESS ERROR*

In *Brecht v. Abrahamson*, the Supreme Court held that the appropriate harmless error standard to apply on habeas corpus review is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also, e.g., Agard v. Portuondo*, 117 F.3d 696, 714 (2d Cir.1997) (applying Brecht harmless error standard on habeas review); *Brewer v. Reynolds*, 51 F.3d 1519, 1529–30 (10th Cir.1995) (applying *Brecht* harmless error standard on habeas review of *Ake* violation), *cert. denied*, 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996). Here, the trial court's error in denying Tyson funding for expert spectrographic voice identification analysis was harmless because the expert ultimately reached an inculpatory conclusion (the voice on the tape was Tyson's), which could not have furthered Tyson's defense.

The fact that the expert came up with an exculpatory theory using "linguistic discourse analysis" does not change this Court's harmless error determination.

First, Tyson should not benefit from having lied to the trial court (indeed, having committed perjury). Tyson's counsel requested payment for the expert on the ground that Tyson represented it was not his voice on the tape, a position Tyson reiterated under oath in his trial testimony. The expert determined it was Tyson's voice on the tape. This is not an area of expert analysis beyond the knowledge of a defendant; Tyson clearly knew it was his voice on the tape, but he repeatedly told the trial court that it was not his voice. He should not benefit from his lies and perjury.

Second, counsel never requested funding for "linguistic discourse analysis." Indeed, Tyson's counsel admitted that he had never heard of such analysis until he received the expert's report. *Ake* does not require payment for experts unless the defendant makes a specific request and shows how an expert's analysis would aid his defense. *See Little v. Armontrout*, 835 F.2d at 1243–44; *Moore v. Kemp*, 809 F.2d at 711–12; *People v. Santos*, 179 A.D.2d 790, 790–91, 579 N.Y.S.2d 130, 131 (2d Dep't) (no error to deny adjournment for defendant to obtain expert witness who was not identified to the court and where defendant failed to demonstrate how the expert's opinion "would be material or favorable to him"), *appeal denied*, 79 N.Y.2d 953, 583 N.Y.S.2d 207, 592 N.E.2d 815 (1992).

Third, and most important, Tyson did not present sufficient evidence to the state court to demonstrate that "linguistic discourse analysis" would be admissible expert testimony in a New York court.

The test for admissibility of scientific evidence in New York remains the *Frye* test of whether a particular procedure is generally accepted as reliable within the scientific community. *See, e.g., People v. Wernick*, 89 N.Y.2d 111, 117, 651 N.Y.S.2d 392, 395, 674 N.E.2d 322 (1996) (recognizing the "need for a *Frye* ... hearing in all instances when a party seeks to present novel scientific or psychiatric or medical evidence"); *People v.*

*Wesley,* 83 N.Y.2d 417, 422 & n. 2, 611 N.Y.S.2d 97, 100 & n. 2, 633 N.E.2d 451 (1994) ("the test pursuant to *Frye v. United States,* 293 F. 1013, poses the elemental question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally"; notes also that while the *Daubert* test is now used in federal trials, New York continues to use the *Frye* test); *People v. Middleton,* 54 N.Y.2d 42, 49, 444 N.Y.S.2d 581, 584, 429 N.E.2d 100 (1981) ("the test is whether a particular procedure ... is generally acceptable as reliable"); *People v. Hughes,* 88 A.D.2d 17, 20, 452 N.Y.S.2d 929, 931 (4th Dep't 1982) ("New York has adopted a test identical to the *Frye* rule in considering the admissibility of evidence produced by various scientific procedures—viz., whether the reliability of the results of a procedure is generally acknowledged in the scientific community."), *aff'd,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983).

Here, as the proponent of the evidence, Tyson bore the burden of proof to demonstrate that the reliability of "linguistic discourse analysis" is generally accepted within the scientific community. *See, e.g., People v. Nieves,* 143 Misc.2d 734, 742, 541 N.Y.S.2d 1008, 1013 (Crim.Ct.1989) (party offering scientific evidence bears the burden of proving its scientific reliability); *see also, e.g., Matter of Luz P., Augusto P.,* 189 A.D.2d 274, 282, 595 N.Y.S.2d 541, § 46 (2d Dep't 1993) (party seeking to have a "facilitator" appointed as an interpreter for a nonverbal child witness has the burden of establishing the facilitator's reliability). Tyson offered no evidence before the state courts to support the general reliability within the scientific community of "linguistic discourse analysis." He thus did not carry his burden under New York's *Frye* standard for admitting expert testimony.

Indeed, by Order dated September 12, 1997, this Court required the parties to present "case law as to the admissibility of 'language discourse analysis' in New York State

Courts." Tyson's counsel responded that he had "found no New York cases which address the issue of the admissibility of 'language discourse analysis.'" (9/24/97 Richman Letter at 1.) [3] The District Attorney's office confirmed that "a search of the relevant case law has failed to uncover a single instance in which language discourse analysis has been accepted as a scientific field of study in a New York court of law." (9/28/97 Letter from A.D.A. Daniel Wanderman, at 1.) The government's research revealed two federal cases in which language discourse analysis testimony was excluded. (*Id.* at 2–3.) *United States v. Kupau,* 781 F.2d 740, 745 (9th Cir.) (no error to exclude expert discourse analysis where the "expert sought to interpret language in ordinary usage, which the district court found would have confused, not assisted, the jury."), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986); *United States v. DeLuna,* 763 F.2d 897, 912 (8th Cir.) (district court properly excluded linguistic discourse analysis expert testimony that would confuse jurors rather than assist them), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); *see also United States v. Schmidt,* 711 F.2d 595, 598 (5th Cir.1983) (no error for district court to exclude testimony of linguistics expert where it complicated and confused issues rather than assisted jurors), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984); *United States v. Hearst,* 563 F.2d 1331, 1350 (9th Cir.1977) (district court did not err in precluding psycholinguistics expert), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). The Court's independent research has not turned up any New York cases, and only one other federal case, discussing the admissibility of language discourse analysis. *See United States v. Clifford,* 704 F.2d 86, 89 & n. 3 (3d Cir.1983) (noting that district court had refused to allow expert testimony as to linguistic analysis because district judge failed to find any cases allowing such testimony), *rev'g on other grounds,* 543 F.Supp. 424, 429–30 (W.D.Pa. 1982).

---

**3.** Tyson's counsel argued that his position is not premised on the admissibility of language discourse analysis testimony, but on the right to have such information in preparing his defense.

(*Id.*) The Court is not willing to extend *Ake* to require a state to fund inadmissible expert analysis. So far as the Court's research reveals, no case has extended *Ake* in this way.

Thus, since spectrographic voice identification did not provide exculpatory evidence for Tyson, and Tyson did not establish that "linguistic discourse analysis" evidence was generally scientifically reliable and thus admissible in New York, the trial court's failure to have approved Tyson's original request to fund the expert testimony is harmless error.

## CONCLUSION

For the reasons set forth above, I recommend that the Court deny Tyson's habeas corpus petition.

Nov. 19, 1997.