Timothy **GILLETTE**, Petitioner,

v.

Charles **GREINER**, Superintendent of Sing Sing Correctional Facility, Respondent.

No. 99 CIV. 2942(SHS).

United States District Court, S.D. New York.

Oct. 29, 1999.

**364**

Timothy Gillette, Dannemora, NY, pro se.

Keith P. Brown, Asst. Attorney General, New York City, for Defendant.

*ORDER*

STEIN, District Judge.

In a Report and Recommendation dated October 4, 1999, Magistrate Judge Andrew J. Peck recommended that petitioner's petition for a writ of *habeas corpus* be denied.

After a *de novo* review of Magistrate Judge Peck's Report and Recommendation dated October 4, 1999, and petitioner's objections dated October 23, 1999,

IT IS HEREBY ORDERED that that Report and Recommendation is adopted by this Court, and petitioner's petition for a writ of *habeas corpus* is denied on the merits.

As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253, as amended by the AEDPA; *see also Rodriquez v. Scully,* 905 F.2d 24 (2d Cir.1990) (*per curiam*) (discussing issuance of a certificate of probable cause under standard prior to amendment of 28 U.S.C. § 2253); *Alexander v. Harris,* 595 F.2d 87, 90–91 (2d Cir. 1979).

Pursuant to 28 U.S.C. § 1915(a) the Court certifies that any appeal from this Order would not be taken in good faith. *See Coppedge v. U.S.,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

*REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge.

Petitioner Timothy Gillette seeks a writ of habeas corpus from his June 1995 conviction of first degree assault, for which he was sentenced to seven and a half to fifteen years imprisonment. Gillette's petition alleges that: (1) the trial court's jury instructions deprived him of a fair trial under the Sixth and Fourteenth Amendments because of the order in which the trial court gave the charge as to a lesser included offense (Pet.¶ 12(I); Gillette Br.

at 16–20), and (2) the trial court's refusal to permit the defense to call a detective on surrebuttal to testify to a witness's prior inconsistent statement deprived Gillette of his right to due process by interfering with his justification defense (Pet.¶ 12(II); Gillette Br. at 20–25).[1]

For the reasons discussed below, Gillette's petition should be denied as without merit.

## FACTS

On October 21, 1994, at approximately 1:00 a.m., an altercation took place between Gillette and two off-duty New York City police officers, Christopher Coppola and Dennis Sheehan. Gillette was charged with attempted second degree murder, three counts of first degree assault, and third degree criminal possession of a weapon. (Aff. of Asst. Atty. General Keith Brown, Ex. A: Indictment No. 10841/94; see Gov't Br. at 2.)

### Officers Sheehan's and Coppola's Testimony

Officers Sheehan and Coppola were assigned to the 19th Precinct, located on East 67th Street between Lexington and Third Avenues. (Tr. 240, 278, 392–93, 421.)[2] Sheehan was 6'3" and weighed 250 pounds, while Coppola weighed the same but was 5'10". (Tr. 276–77, 447–48.) Gillette was 5'9" and weighed approximately 170 pounds. (Tr. 304, 448.) On the night of the incident, October 20–21, 1994, Sheehan and Coppola were off-duty and went to a benefit, where they had a couple of beers. (Tr. 240–41, 249–50, 318–21, 394–97.) After the benefit, Sheehan and Coppola went to two other bars. (Tr. 251–54, 324–25, 397–99, 426–27.) Sheehan testified that he had four beers over the course of the evening. (Tr. 250–54, 321, 324–25.) Coppola testified to drinking five or six beers. (Tr. 431–32.) Both testified that

they were not drunk and felt "fine." (Tr. 325, 431–33; see also Tr2. 26, 86.) At around 1:00 a.m. on October 21, 1994, they took a taxicab to go back to the 19th Precinct to pick up Sheehan's car to drive home to Long Island. (Tr. 254, 399–400.)

At Second Avenue and 87th Street, the cab stopped for a red light. (Tr. 241, 257, 289, 400, 405–06, 434, 436.) Gillette walked in front of the cab and stayed there when the light turned green. (Tr. 400, 406, 436.) The cab driver blew his horn, Gillette got mad and banged on the cab's hood, and the driver and Gillette began yelling at each other. (Tr. 241, 257–58, 287, 293, 400, 405, 436–38.)

Coppola got out of the cab and told Gillette to " 'get the fuck out of here' " so he could get home. (Tr. 241–42, 258, 294–95, 400, 407, 438.) Gillette started approaching Coppola and said " 'who the fuck are you?' " (Tr. 242, 296, 401, 408, 439, 442.) Coppola responded " 'I'm a police officer. Now get the hell out of here.' " (Tr. 242, 259, 296–97, 401, 408, 439, 442.)

When Coppola identified himself as a police officer, Sheehan got out of the cab because he "didn't want anything else to happen." (Tr. 242, 258, 298–99, 302–03, 329.) Gillette walked toward Coppola, still yelling, and Coppola saw him take a "box-cutter-type blade" out of his pocket. (Tr. 300, 401, 408–09, 442–43.) Coppola had left his gun at the precinct because he was going out drinking (Tr. 305, 380, 395–96, 445–46), so he tried to grab Gillette to protect himself. (Tr. 243, 260–61, 306–07, 353, 401, 408–09, 442, 444, 449.) In an instant, Coppola "felt the heat and saw the blood spurting out of [his] face" from a bad cut that went straight through his cheek. (Tr. 402; see also Tr. 243, 261, 450.) Coppola heard a woman scream after he was cut. (Tr. 448.)

---

1. References to "Gillette Br." are to his counsel's brief to the First Department, which Gillette attached to and incorporated by reference in his present federal habeas petition.

2. References to "Tr." are to the trial transcript for May 15, 16 and 19, 1995; references to "Tr2." are to the trial transcript for May 22, 23 and 25, 1995. (See Gov't Br. at 3 n. 1; Gillette Br. at 4 n. 1.)

Coppola hit Gillette twice and tried to hold him, but Gillette wrestled free. (Tr. 243, 402, 409–10, 450.) Coppola and Sheehan both tried to hold Gillette, but Gillette wrestled out of his shirt and out of their hold, and started running away. (Tr. 243–44, 262–64, 358, 402–03, 410.) Coppola and Sheehan gave chase, and caught Gillette at Second Avenue and 88th Street. (Tr. 244, 264, 360, 403, 411, 456.) "There was blood everywhere." (Tr. 245; see also Tr. 264–67, 361.) Sheehan called 911 for backup and for an ambulance. (Tr. 244–45, 265, 403.) Gillette got free again, but was captured on First Avenue between 87th and 88th Streets by the backup officers. (Tr. 245–48, 266–67, 269, 403–04, 516–18, 520–21, 525, 546–47; Tr2. 39–40.) The police recovered the boxcutter from the corner of Second Avenue and 87th Street. (Tr2. 20, 56–58, 60–61, 66–67, 75–77.) The police took Coppola to the hospital, where he had surgery. (Tr. 405, 411–12, 552, 556–57.) Coppola has a permanent scar on his face. (Tr2. 89–90.)

### Testimony of Other Witnesses to the Incident

The prosecution called one civilian witness to the incident, Peter Friedrich. (Tr. 463.) Friedrich was walking down Second Avenue and noticed Gillette standing in front of a cab after the light turned green. (Tr. 465, 470.) Friedrich saw Coppola get out of the cab and tell Gillette to get out of the way. (Tr. 466, 474.) Gillette "became very angry, and there was some yelling back and forth." (Tr. 466, 471, 497.) According to Friedrich, Gillette was the aggressor. (Tr. 499, 511.) Friedrich saw Gillette reach into his back pocket but could not see if he had anything in his hand. (Tr. 466, 475, 480, 497, 501–03.) Then Sheehan and a woman (Martha Cabrera) who earlier had been talking to Gillette tried to separate Gillette and Coppola. (Tr. 466, 478.) There was a "wrestling match" and Friedrich saw Coppola with blood on his face, looking shocked. (Tr. 467–68, 481–82, 509–10.) Gillette's

shirt came off and he ran away; the woman was screaming. (Tr. 468, 482.)

The defense called a different witness to the incident, Martha Cabrera, who testified that she and a friend, Marcy Fingerhet, met Gillette for the first time at a pool hall earlier that evening. (Tr2. 113–14, 123, 133.) Cabrera consumed one twenty-two ounce bottle of St. Ives Malt liquor, Gillette drank a forty ounce bottle of Budweiser, and they shared another forty ounce bottle of Budweiser. (Tr2. 134–36.) Cabrera testified that Gillette was not drunk. (Tr2. 138.) Cabrera, Fingerhet and Gillette left the pool hall, went to a local park, and decided to go to a restaurant on 90th Street and First Avenue. (Tr2. 115–16, 136–37.) They crossed Second Avenue at 87th Street, with the light. (Tr2. 116.)

Cabrera testified that Gillette neither said nor did anything to the occupants of the taxicab before Coppola got out. (Tr2. 139–40, 142.) Cabrera never heard Coppola or Sheehan identify themselves as police officers. (Tr2. 127.) Cabrera never saw anything in Gillette's hands during the altercation. (Tr2. 122–23, 144.) According to Cabrera, Coppola got out of the cab, grabbed Gillette by the collar and punched him two or three times in the face. (Tr2. 118–19, 121–22, 139, 145, 148.) Coppola dragged Gillette to the nearby curb and continued to hit him "too many times to count." (Tr2. 123, 145, 148, 150–51.) Cabrera tried to separate them and asked Sheehan to intervene. (Tr2. 123–25, 148–49.) Unable to stop the fight, Cabrera called 911. (Tr2. 126–27, 152.) While making the 911 call, Cabrera noticed that her hands and clothing were stained with blood, but did not know where the blood came from. (Tr2. 125–26.) Cabrera was screaming. (Tr2. 128.)

Tariq Asghar drove the taxicab that was behind the cab in which Coppola and Sheehan were riding. Because Asghar was arrested on unrelated charges during the trial, the parties stipulated as to what he would have testified. (See Tr2. 11–19, 70–

72, 79–80, 158.) The trial judge read the parties' stipulation concerning Asghar's testimony to the jury:

> The second stipulation is to the effect that if Tariq Asghar were called to testify, he would testify as follows:
>
> That at approximately 1:15 in the morning on Thursday, October 21, 1994, [Asghar] was driving a yellow cab that was stopped short of the northeast corner of Second Avenue and East 87th Street in Manhattan.
>
> Stopped at a traffic light directly in front of him in the eastern most lane of traffic was another yellow cab. A male white was standing in front of the first taxicab. Two men seated in the passenger compartment of the first taxicab started yelling at the man standing in front of the taxicab. The man standing in front of the taxicab started yelling to two females standing on the northwest corner of 87th Street and Second Avenue. The two males in the rear passenger compartment of the first taxicab exited the taxicab and proceeded towards the man standing in front of the taxicab. The two men from the rear passenger compartment of the taxicab were walking in an unbalanced manner.
>
> Mr. Asghar then moved his cab to the southeast corner of 87th Street and Second Avenue. The slim female made a phone call. Mr. Asghar then noticed the man who was in front of the cab start running northbound on Second Avenue towards 88th Street.
>
> *During the fight, the male who was standing in front of the cab was screaming for help.*

(Tr2. 160–62, emphasis added.)

The prosecution called Sergeant Edward Blair as a rebuttal witness. (Tr2. 166.) Blair testified that when he interviewed Cabrera, she said that "there was screaming back and forth, people in the cab were screaming at Mr. Gillette [and] Mr. Gillette was screaming at the people in the cab." (Tr2. 169.) The prosecution's second rebuttal witness, Detective Gilbert

Rivera, testified that when he interviewed Cabrera on the night of the incident, she appeared to be drunk, and she told him that she and Gillette "had been drinking and were drunk." (Tr2. 173–74, 176, 179.)

The defense and prosecution's cases concluded on Tuesday May 23, 1995, and the jury was instructed to return on Thursday, May 25, 1995. (Tr2. 181.) On Thursday morning, May 25, the prosecutor informed the court that Asghar had been released the day before and was waiting in the witness room. (Tr2. 203.) The prosecutor informed the court that according to Asghar, the last line of the stipulation as to his testimony was incorrect: while Asghar heard a scream, Asghar could not identify its source. (Tr2. 203.) The prosecutor asked to have the stipulation amended. (Tr2. 203, 208.) The defense responded that the last line of the stipulation came verbatim from the police report (the DD–5) of their interview with Asghar and that it was unfair to call Asghar after the close of the prosecution's rebuttal case. (Tr2. 206–07.) The court gave the parties the choice of amending the stipulation or withdrawing it and having Asghar testify. (Tr2. 210–13.) Defense counsel chose not to stipulate. (Tr2. 213.) The court explained to the jury that the stipulation was withdrawn because Asghar was available to testify. (Tr2. 214.)

Asghar testified that he was driving his cab and stopped behind another taxi at a red light at Second Avenue and 87th Street on October 21, 1994 at 1:00 a.m. (Tr2. 215–16, 220.) He saw two passengers get out of the other cab and one person standing in front of it. (Tr2. 216, 220–21.) As Asghar moved his cab to the left of the cab in front of him, he noticed that the man standing in front of the cab was yelling and waving at two girls on the corner. (Tr2. 216–17.) Coppola and Sheehan walked towards Gillette and said something to him, arguing with him. (Tr2. 217, 222, 224.) Asghar saw Cabrera run from the corner towards Gillette. (Tr2.

217.) Asghar moved his cab to the far corner where he saw the three men "throwing punches at each other," but he did not see who threw the first punch. (Tr2. 217–20, 227.) On cross-examination by the defense, Asghar reiterated that he never told the police who screamed "help," and that if Detective Berkeley took down the statement wrong, it was the detective's "misunderstanding." (Tr2. 229–34.)

The prosecution also called Marcy Fingerhet, Cabrera's friend, as an additional rebuttal witness. (Tr2. 235–36.) Fingerhet testified that she and Cabrera met Gillette in a pool hall on October 20, 1994. (Tr2. 236–37.) As they were crossing Second Avenue and 87th Street, Fingerhet waited when Gillette and Cabrera crossed the street as the light was changing. (Tr2. 237–38.) Fingerhet heard one of the cab's passengers tell Gillette to get out of the way. (Tr2. 237–38.) She "turned away a couple of seconds" and saw Coppola struggling with and shaking Gillette. (Tr2. 238.) She did not see Coppola hit Gillette. (Tr2. 238.)

Outside the jury's presence, defense counsel sought permission to call Detective Berkeley, who wrote the DD–5 in which Asghar stated that Gillette had screamed:

> [DEFENSE COUNSEL]: Your Honor, given the fact that Mr. Asghar has been allowed to testify without any prior notice, I am requesting an opportunity to call Det. Berkeley as a surrebuttal witness. I believe his testimony is significant and I believe that, that the fact that Mr. Asghar is now retreating from his previous statement set forth in the DD–5 [that] it was Mr. Gillette as opposed to one of the other participants or bystanders involved in this matter, is of the utmost significance in terms of Mr. Gillette's defense. If it was somebody else screaming for help, it has one meaning. If it was the defendant who was scream-

ing for help, it goes directly to a claim of justification.

> THE COURT: All right, I am satisfied that you have made it clear to the jury, and even Mr. Asghar has made it clear to the jury, he may have well have said that to the detective, but that isn't what he meant, and I see no purpose in delaying the proceeding for the purpose of calling the detective.

> Your application is denied. You have an exception.... I am satisfied the record is clear, one, it is on the DD–5; and two, what [Asghar's] explanation of the reason why it's on the DD–5.

> [DEFENSE COUNSEL]: Your Honor, the fact the witness, that the prosecution's witness has had an opportunity to try to explain a prior inconsistent statement should not prevent me from calling a rebuttal, or in this case surrebuttal witness as to a prior inconsistent statement. The fact is that Mister—

> THE COURT: You have made your record.... You have an exception to my ruling.

(Tr2. 241–43.) [3]

### The Jury Charge

The trial court informed counsel during the charge conference that he would charge, in the alternative, second degree attempted murder, first degree assault (with intent to cause serious physical injury), and first degree assault (depraved indifference). (Tr2. 184–86.) Defense counsel requested that the court also submit a lesser-included charge of second degree assault on the theory of recklessness. (Tr2. 192.) The court acknowledged the defense's entitlement to that charge:

> Yes, it seems to me that you would be entitled to that [Penal Law] 120.05, Subdivision 4. So we would amend the verdict sheet so that after the third count it would read, if you find the defendant

---

**3.** At the time of sentencing, defense counsel moved to set aside the verdict because of the court's exclusion of Detective Berkeley as a surrebuttal witness. (6/21/95 Sentence Tr. 4– 5.) The court denied the motion, finding that "the proposed surrebuttal testimony ... would have been collateral." (*Id.* at 5–7.)

guilty, cease your deliberations and report your verdict. If you find the defendant not guilty, proceed to consider whether he is guilty or not guilty of the lesser-included charge of assault in the second degree.

(Tr2. 192.) Defense counsel, however, urged the court to read the lesser-included charge after first degree assault (with intent to cause serious injury). (Tr2. 193.) Defense counsel argued that "Assault in the second degree on the theory of recklessness is a lesser-included charge of that charge of assault in the first degree, intentional" and thus should be considered before the first degree assault (depraved indifference) charge. (Tr2. 193.)

The court replied:

I am just putting it in a different order. *What I am doing is submitting the greater charges first and the lesser charges last.* So, it is both a lesser charge of assault in the second degree under the second count, and the lesser charge of assault in the second degree under the third count, and I am telling the jury to reach that last because I am submitting the charges in the alternative.

(Tr2. 193, emphasis added.) Defense counsel excepted. (Tr2. 193–94.)

The court submitted four counts to the jury, in the alternative: second degree attempted murder, two counts of first degree assault, and one count of second degree assault. (Tr2. 326–27.) The court explained to the jury that "in the alternative ... means that you may find the defendant not guilty of all of the counts, but if you find him guilty, you may only find him guilty of one of those counts." (Tr2. 327.) The court ordered the jury to first examine the attempted murder count, followed by first degree assault (intentional), then first degree assault (depraved indifference), and lastly, second degree assault (reckless). (Tr2. 357–58; *see also* Tr2. 327–32, 333–34, 343–48, 348–53, 353–55.) The court also instructed the jury on the defense of self-defense/justification. (Tr2. 335–43.)

### Verdict and Sentence

On May 25, 1995, the jury found Gillette not guilty of attempted murder and first degree assault (intentional), but convicted Gillette on the third count of first degree assault (depraved indifference). (Tr2. 405.) The court sentenced Gillette as a predicate felon to seven and a half to fifteen years imprisonment, the maximum sentence for the offense. (6/21/95 Sentence Tr. 2–3, 10, 15.)

### Gillette's Direct Appeal

Gillette appealed his conviction to the First Department. (Brown Aff. ¶ 3 & Ex. B: Gillette 1st Dep't Br.) The First Department affirmed Gillette's conviction on October 15, 1998. *People v. Gillette*, 254 A.D.2d 121, 680 N.Y.S.2d 207 (1st Dep't 1998), holding:

Since defendant was convicted of assault in the first degree on the theory of "depraved indifference" but was acquitted of the crimes of attempted murder in the second degree and assault in the first degree on the theory of intent to cause serious physical injury, the court's erroneous submission to the jury of assault in the second degree as a lesser included offense under the count of assault in the first degree under the "depraved indifference" count instead of the "intent" count was harmless error. Contrary to defendant's suggestion, he was not entitled to have the counts submitted in an order that might lead the jury "to convict defendant of a lesser crime than his conduct actually warranted."

The court properly exercised its discretion in denying defendant permission to call a detective in sur-rebuttal. The circumstances of the witness's purported prior inconsistent statement made to this detective were exhaustively explored, and the detective's testimony would have added nothing.

*People v. Gillette,* 254 A.D.2d at 122, 680 N.Y.S.2d at 208 (citations omitted).

On March 2, 1999, the New York Court of Appeals denied leave to appeal. *People v. Gillette,* 93 N.Y.2d 873, 689 N.Y.S.2d 435, 711 N.E.2d 649 (1999).

### Gillette's Present Habeas Petition

Gillette's habeas petition, dated March 23, 1999 and received by the Court's pro se office on April 5, 1999, raises the same two claims that he presented to the First Department: (1) the trial court's submission of second degree reckless assault as a lesser included offense under the wrong count of the indictment deprived Gillette of a fair trial (Pet.¶ 12(I); Gillette Br. at 16–20); and (2) the court's refusal to permit the defense to call a detective to testify to a witness's prior inconsistent statement denied Gillette due process by interfering with his justification defense (Pet.¶ 12(II); Gillette Br. at 20–25). Indeed, Gillette's petition merely attaches his counsel's brief to the First Department, with no new or independent argument.

### ANALYSIS

### I. THE TRIAL COURT'S CHARGE TO THE JURY DID NOT VIOLATE GILLETTE'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL

Gillette claims that the trial "court's erroneous refusal to submit the lesser offense under the proper count in the indictment deprived [Gillette] of a fair trial" under the Sixth and Fourteenth Amendments. (Gillette Br. at 17.)

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)); *see also, e.g., Benitez v. Senkowski,* 97 Civ. 7819, 1998 WL 668079 at *4 (S.D.N.Y. Sept.17, 1998) (Cote, D.J. & Peck, M.J.); *James v. Senkowski,* 97 Civ. 3327, 1998 WL 217903 at *5 (S.D.N.Y. April 29, 1998) (Cote, D.J. & Peck, M.J.); *Simmons v. Ross,* 965 F.Supp. 473, 480 (S.D.N.Y.1997).

As the Second Circuit has stated: "In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990) (quoting *Casillas v. Scully,* 769 F.2d 60, 63 (2d Cir.1985)); *see also, e.g., Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Ellison v. Hoke,* No. 93 CV 3048, 1995 WL 561344 at *3 (E.D.N.Y. Sept.15, 1995); *Godfrey v. Irvin,* 871 F.Supp. 577, 580 (W.D.N.Y.1994).

■ Failure to give a properly requested jury charge does not by itself violate a petitioner's right to due process. *See, e.g., Blazic v. Henderson,* 900 F.2d at 541 ("A mere error of state law does not deny a defendant his right to due process."); *Schaefer v. Leone,* 443 F.2d 182, 185 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 277, 30 L.Ed.2d 251 (1971). "For an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction violates due process.'" *Blazic v. Henderson,* 900 F.2d at 541 (quoting *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. at 400); *see also, e.g., Casillas v. Scully,* 769 F.2d at 63 ("In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law."); *Carmona v. Artuz,* 96 Civ. 8045, 1997 WL 876737 at *11

(S.D.N.Y. Oct.7, 1997) ("Jury charges that contain errors, even if they lead to the jury misapplying state law, do not ordinarily give rise to federal habeas corpus relief in non-capital cases.... Rather, an erroneous jury charge must have 'infected the entire trial' to be a cognizable claim in a habeas corpus proceeding."), *report & rec. adopted,* 96 Civ. 8045, 1998 WL 213781 (S.D.N.Y. April 29, 1998); *Ellison v. Hoke,* 1995 WL 561344 at *3; *Godfrey v. Irvin,* 871 F.Supp. at 581. The challenged instruction is not to be viewed in isolation, but "in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. at 400; *see also, e.g., Vargas v. Keane,* 86 F.3d 1273, 1277 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996); *Bramble v. Smith,* 96 Civ. 5905, 1998 WL 395265 at *17 (S.D.N.Y. July 15, 1998); *Carmona v. Artuz,* 96 Civ. 8045, 1997 WL 876737 at *11; *Godfrey v. Irvin,* 871 F.Supp. at 581. As the Supreme Court has observed, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," and thus the petitioner's "burden is especially heavy." *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977); *accord, e.g., Bramble v. Smith,* 1998 WL 395265 at *17.

■ While Gillette's First Department brief claims that the trial court's error in the order of the jury charge deprived him of a fair trial in violation of due process (Gillette Br. at 17), he does not cite a single federal case in which the order of a jury charge was held to violate due process. Nor has this Court's research found such a case. There is no due process violation from the order in which jury instructions are given.

Even if there could be a case in which the order of jury instructions caused a due process violation, this is not such a cause. The trial court here instructed the jury to consider the four counts in the alternative. (Tr2. 326–27.) They were instructed first to determine whether Gillette was guilty of second degree attempted murder; if not guilty, to consider first degree assault (intentional); if not guilty, to consider first degree assault (depraved indifference); and if not guilty, to consider second degree assault (reckless). (*E.g.,* Tr2. 357–58; *see* page 11 above.) Gillette contends that because second degree assault is a lesser included offense of first degree assault (intentional), it should have been charged and considered before first degree assault (depraved indifference). (Gillette Br. at 20.)[4]

Viewed in the context of the entire charge, as this Court must, the trial court's placement of the lesser included offense charge as the last charge for the jury to consider was not constitutional error. The ordering of the charge did not infect the entire trial. The trial court placed the charges so that the jury first considered the more serious counts (attempted murder and two counts of first degree assault),

**4.** The First Department held that the trial judge erred when he stated that second degree assault was a lesser included offense of both first degree assault counts. *People v. Gillette,* 254 A.D.2d 121, 122, 680 N.Y.S.2d 207, 208 (1st Dep't 1998), *appeal denied,* 93 N.Y.2d 873, 689 N.Y.S.2d 435, 711 N.E.2d 649 (1999). However, while the trial judge told counsel during the charge conference that second degree assault was a lesser included charge for both first degree assault counts (Tr2. 193), the trial judge never told that to the jury. Rather, he told the jury to consider the four counts, in order, in the alternative, so as to only reach the fourth count as to second degree assault if the jury found Gillette not guilty of the attempted murder and both first degree assault charges. (*E.g.,* Tr2. 357–58; *see* page 11 above.) Thus, the trial judge's erroneous belief that second degree assault was a lesser offense of both first degree assault counts was never made known to the jury and does not form a ground for federal habeas relief. *See United States v. Woodson,* 838 F.2d 468 (table), 1988 WL 4584 at *2 (4th Cir. Jan.19, 1988) ("The court told the jury to consider each of the lesser included offenses separately. The court did not tell the jury that one lesser included offense is included within another, nor did the verdict form so indicate." Thus, no error where order on verdict form had a lesser included offense listed before a greater offense.)

and then the lesser charge of second degree assault. (Tr2. 193, quoted at page 10 above.) Ordering the charges from greater to lesser here made perfect sense, and was easy for the jury to follow. *See United States v. Woodson*, No. 87–5087, 838 F.2d 468 (table), 1988 WL 4584 at *2 (4th Cir.1988) ("the better practice would have been to instruct the jury to consider the charges in order of their severity").

Gillette does not claim that if the jury found him guilty of second degree assault as a lesser included offense of first degree assault (intentional), it could not have considered the first degree assault (depraved indifference) count. (*See* Gillette Br. at 20.) The most Gillette can say is that:

> Had the court properly submitted the lesser offense under intentional assault, count two of the indictment, the jury would have considered, and undoubtedly convicted appellant of, reckless assault prior to turning to the final count, depraved indifference assault. With a guilty verdict in hand, the outcome of deliberations on the final count might well have been different, with jurors either acquitting appellant outright of depraved indifference assault or, at a minimum, unable to agree on a verdict.

(Gillette Br. at 20.) Thus, Gillette's approach would have required the jury to consider second degree assault and even if it found Gillette guilty of that lesser charge, then to consider first degree depraved indifference assault. That is less efficient than the trial court's approach. Gillette does not claim that the evidence was not sufficient to find him guilty of first degree depraved indifference assault. His hope for a compromise verdict or hung jury if the jurors first found him guilty of the lesser charge is speculative, and insulting to the jury. It does not state a due process claim.

In any event, before there can be constitutional error in the jury charge, Gillette must show that the charge was erroneous as a matter of state law. (*See* cases cited on pages 370–71 above.) The New York Court of Appeals has upheld ordering jury instructions in such a way that the jury considers the greater counts before the lesser counts.

In *People v. Johnson*, 87 N.Y.2d 357, 639 N.Y.S.2d 776, 662 N.E.2d 1066 (1996), the trial court instructed the jury to first consider, in the alternative, intentional murder and then depraved mind murder. *See People v. Johnson*, 87 N.Y.2d at 359, 639 N.Y.S.2d at 776, 662 N.E.2d 1066. If the jury found the defendant not guilty on these two counts, they were then instructed to consider first-degree manslaughter (lesser included offense of intentional murder) followed by second-degree manslaughter (lesser included offense of depraved mind murder). *Id.* In upholding the trial court's instructions, the court noted that "[n]othing contained in article 300 of the Criminal Procedure Law ... directs the order in which the jury should consider the various offenses submitted to it. Its provisions neither authorize nor proscribe the manner in which the jury ... [is] to consider the inconsistent greater and lesser included offenses...." *People v. Johnson*, 87 N.Y.2d at 360, 639 N.Y.S.2d at 777, 662 N.E.2d 1066.

The challenged jury charge in this case is equivalent to the charge in *Johnson*. Both juries were instructed to consider, in the alternative, the greater offenses before considering the lesser included offenses. As the New York Court of Appeals explained, "the jury's consideration of first the greater and then the lesser offenses properly allows the jury to consider the offenses in decreasing levels of culpability," and allows the jury "to render a verdict that fully reflects defendant's culpability." *People v. Johnson*, 87 N.Y.2d at 360–61, 639 N.Y.S.2d at 777, 662 N.E.2d 1066. The trial court's charge here, which directed the jury to consider, in the alternative, the counts of greater culpability before considering the lesser included offense, was proper under New York law. Therefore, no constitutional violation occurred.

Gillette was not deprived of his due process right to a fair trial under the Sixth and Fourteenth Amendments by the trial court's ordering of the jury charge.

## II. GILLETTE'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED BY THE EXCLUSION OF THE SURREBUTTAL TESTIMONY OF DETECTIVE BERKELEY

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' ... [A]n essential component of procedural fairness is an opportunity to be heard." *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986) (citations omitted).[5]

■ Nevertheless, the Supreme Court has "acknowledge[d] also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence.... [T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice [or] confusion of the issues.'" *Crane v. Kentucky,* 476 U.S. at 689–90, 106 S.Ct. at 2146.[6] "Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane v. Kentucky,* 476 U.S. at 690, 106 S.Ct. at 2146. Whether the exclusion of evidence violates a defendant's "right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist. Thus, where 'the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir.1996) (citations omitted, brackets in original); *see also, e.g., McLean v. McGinnis,* 189 F.3d 461, 1999 WL 642925 at *2 (2d Cir.1999); *Williams v. McCoy,* 7 F.Supp.2d 214, 222 (E.D.N.Y.1998); *Deutsch v. Jacobson,* 97 Civ. 2387, 1997 WL 381930 at *3 (S.D.N.Y. July 8, 1997).

■ The Court cannot say that the trial court's refusal to allow Gillette to call Detective Berkeley, evaluated in the context of the entire record, created a reasonable doubt that did not otherwise exist or deprived Gillette of a meaningful opportunity to present a complete defense.

The jury heard the original stipulation concerning Asghar's testimony, including this sentence: "*During the fight,* the male who was standing in front of the cab was screaming for help." (Tr2. 161–62, emphasis added.) When Asghar testified, however, he said he could not tell who had screamed "help." (Tr2. 229–34.) Asghar also testified that Detective Berkeley misunderstood Asghar when Berkeley wrote that Asghar said Gillette screamed for

---

**5.** *See also, e.g., Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988); *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Chambers v. Mississippi,* 410 U.S. at 294, 93 S.Ct. at 1045; *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

**6.** *See also, e.g., Montana v. Egelhoff,* 518 U.S. 37, 53, 116 S.Ct. 2013, 2022, 135 L.Ed.2d 361 (1996); *Taylor v. Illinois,* 484 U.S. at 410–16, 108 S.Ct. at 653–56; *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *Chambers v. Mississippi,* 410 U.S. at 295, 93 S.Ct. at 1046; *Claudio v. Scully,* 791 F.Supp. 985, 990–91 (E.D.N.Y.1992).

help. (Tr2. 229–34.) Gillette argues that the "subject matter of the prior statement—whether Tariq Asghar knew that the screams for help were coming from [Gillette]—was crucial to the defense case. Clearly, if Asghar heard [Gillette] screaming for help, it tended to support the testimony of Martha Cabrera that Officer Coppola was pummeling [Gillette] for no reason before [Gillette] raised a hand to Coppola." (Gillette Br. at 23.)

Detective Berkeley's evidence, however, would not have materially aided Gillette's self-defense/justification defense. Detective Berkeley's testimony would have been that contrary to Asghar's trial testimony, Asghar said, as reflected on the DD–5 report, that "[d]uring the fight, [Gillette] was screaming for help." (Tr2. 161–62 (stipulation), 206–07 (defense representation that the last line of the stipulation came verbatim from the DD–5 report), 242–43.) Gillette correctly concedes that even if Detective Berkeley so testified, Asghar's "prior inconsistent statement itself could not be used to establish the truth that it was [Gillette] doing the screaming." (Gillette Br. at 25.) Gillette claims, however, that "other evidence in the case, particularly Martha Cabrera's testimony, would have made that a likely inference for the jurors." (Gillette Br. at 25.)

Even if the jury were to infer, as Gillette suggests, that Gillette screamed for help, that would not materially aid Gillette's justification defense. The DD–5 merely reflected that according to Asghar, Gillette screamed for help "[d]uring the fight." (Tr2. 161.) The justification defense, however, turned in part on who started the fight, and Detective Berkeley's testimony as to Asghar's statement would not have addressed that question. In any event, however, the jury heard the stipulation, and the issue of what Asghar said to Detective Berkeley and Asghar's explanation for what Detective Berkeley wrote down were explored at length before the jury during Asghar's cross-examination. (Tr2. 229–34.) In addition, the jury was told it would hear summations and be charged that day, and there was no indication as to how soon Detective Berkeley could be summoned to court. In light of all these factors, the trial court did not commit constitutional error in rejecting Gillette's request to call Detective Berkeley on surrebuttal.

Even if the Court were to assume, arguendo, that the trial court erred in excluding Detective Berkeley's testimony, any such error was harmless. In *Brecht v. Abrahamson,* the Supreme Court held that the appropriate harmless error standard to apply on habeas corpus review of trial errors, such as the exclusion of evidence, is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also, e.g., O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Agard v. Portuondo,* 117 F.3d 696, 714 (2d Cir.1997); *Peck v. United States,* 106 F.3d 450, 454 (2d Cir. 1997); *Peck v. United States,* 102 F.3d 1319, 1321 (2d Cir.1996) (en banc) (Newman, C.J., concurring); *Glenn v. Bartlett,* 98 F.3d 721, 729 (2d Cir.1996), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997); *Brewer v. Reynolds,* 51 F.3d 1519, 1529–30 (10th Cir.1995), *cert. denied,* 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996); *Mercado v. Stinson,* 37 F.Supp.2d 267, 276–77 (S.D.N.Y.1999) (Baer, D.J. & Peck, M.J.); *Tyson v. Keane,* 991 F.Supp. 314, 316 (S.D.N.Y. 1998) (Scheindlin, D.J. & Peck, M.J.); *James v. Senkowski,* 97 Civ. 3327, 1998 WL 217903 at *9 (S.D.N.Y. April 29, 1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 445 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.) (under the *Brecht* standard "a Petitioner is not entitled to habeas relief based on trial error unless he or she can establish that the error resulted in actual prejudice").

The exclusion of Detective Berkeley's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict against Gillette. The witnesses to the incident, except Cabrera, testified that Gillette was the aggressor. (*See* pages 3–5 above.) Detective Berkeley's testimony that Asghar said that Gillette screamed for help during the fight would not have been admissible for the truth of that assertion; even if the jury inferred that Gillette screamed for help "during the fight," that would not shed light on who started the fight, whether Gillette's scream for help was before or after he slashed Coppola's face with the boxcutter, or whether Gillette could have with safety retreated before he took out, and used, the boxcutter. Detective Berkeley's testimony, in light of all the evidence, would not have advanced Gillette's justification defense. Any error in its exclusion was harmless.

### CONCLUSION

For the reasons set forth above, Gillette's habeas corpus petition should be denied on the merits.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMEN-DATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);

*IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

October 4, 1999.